IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| PATRICIA ROBINSON, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| V. | § | CIVIL ACTION NO. H-06-1736 |
| | § | |
| MICHAEL ASTRUE, | § | |
| COMMISSIONER OF THE SOCIAL | § | |
| SECURITY ADMINISTRATION, | § | |
| | § | |
| Defendant. | § | |

## MEMORANDUM AND ORDER GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Before the Court[1] in this social security appeal is Defendant's Motion for Summary Judgment and Brief in Support (Document No. 23), and Plaintiff's Motion for Summary Judgment (Document No. 22). Having considered the cross motions for summary judgment, the administrative record, and the applicable law, the Court ORDERS, for the reasons set forth below, that Defendant's Motion for Summary Judgment (Document No. 23) is DENIED, Plaintiff's Motion for Summary Judgment (Document No. 22) is GRANTED, and the decision of the Commissioner is REMANDED for further proceedings.

---

[1] The parties consented to proceed before the undersigned Magistrate Judge on August 31, 2006. (Document No. 12).

## I.  Introduction

Plaintiff Patricia Robinson ("Robinson") brings this action pursuant to Section 205(g) of the Social Security Act ("Act"), 42 U.S.C. § 405(g), seeking judicial review of a final decision of the Commissioner of the Social Security Administration ("Commissioner") denying her application for disability insurance benefits ("DIB").  Robinson argues that substantial evidence does not support the ALJ's decision, and that the ALJ, Earl W. Crump, committed errors of law when he found that Robinson retained the residual functional capacity ("RFC") for light work that involves "only occasional climbing, balancing, stooping, kneeling, crouching, crawling and only occasional reaching overhead with left arm" (Tr. 113, 114), that Robinson could perform her past relevant work as a security guard, and that she was, therefore, not disabled.  Robinson contends that the ALJ failed to apply the appropriate legal standards and that substantial evidence does not support the ALJ's decision. According to Robinson, the ALJ erred by not following the proper legal standards in determining that she could perform her prior relevant work as a security guard, and that he erred in failing to assess the impact of obesity under SSR 02-01p in combination with her other impairments at step three, and in determining her RFC at step four.  Robinson moves the Court for an order reversing the Commissioner's decision and awarding benefits, or in the alternative, an order remanding her claim for further proceedings.  The Commissioner responds that there is substantial evidence in the record to support the ALJ's decision that Robinson was not disabled as a result of her impairments, the decision comports with applicable law, and it should therefore be affirmed.

## II.  Administrative Proceedings

Robinson applied for DIB on October 22, 2003, claiming that she has been unable to work since November 23, 2001, due to rheumatoid arthritis, back pain, and high blood pressure. (Tr. 155-157). The Social Security Administration denied her application at the initial and reconsideration stages. (Tr. 115-116, 117-124, 130-133). After that, Robinson requested a hearing before an ALJ. (Tr. 134). The Social Security Administration granted her request (Tr. 135-136) and the ALJ held a hearing on June 8, 2005, at which Robinson's claims were considered *de novo*. (Tr. 324-349). On August 23, 2005, the ALJ issued his decision finding Robinson not disabled. (Tr. 106-114). The ALJ found that Robinson had not engaged in substantial gainful activity since the alleged onset of disability. At steps two and three, he found that Robinson has lumbar strain, status post laceration, left arm, and obesity, all of which are severe impairments within the meaning of the Act, but that these impairments did not meet or equal the requirements of a listed impairment. Based on the medical records, and the testimony of Robinson, the ALJ concluded that Robinson's allegations concerning her limitations were "only generally credible." (Tr. 112, 114). The ALJ further found at step four that Robinson could return to her past relevant work as a security guard, and was not disabled within the meaning of the Social Security Act. (Tr. 113).

Robinson then asked for a review by the Appeals Council of the ALJ's adverse decision. (Tr. 105). The Appeals Council will grant a request to review an ALJ's decision if any of the following circumstances are present: (1) it appears that the ALJ abused his discretion; (2) the ALJ made an error of law in reaching his conclusion; (3) substantial evidence does not support the ALJ's actions, findings, or conclusions; or (4) a broad policy issue may affect the public interest. 20 C.F.R.

§§ 404.970, 416.1470.  After considering Robinson's contentions contained in her Brief in Support of Request for Review of Hearing Decision and New Evidence (Tr. 8-100), in light of the applicable regulations and evidence, the Appeals Council concluded, on February 24, 2006, that there was no basis upon which to grant Robinson's request for review.  (Tr. 4-6).  The ALJ's findings and decision thus became final.  Robinson has timely filed her appeal of the ALJ's decision.  42 U.S.C. § 405(g).  Both Robinson and the Commissioner have filed Motions for Summary Judgment (Document Nos. 22 &  23).  This appeal is now ripe for ruling.

The evidence is set forth in the transcript, pages 1 through 349 (Document No. 8).  There is no dispute as to the facts contained therein.

## III.  Standard for Review of Agency Decision

The court's review of a denial of disability benefits is limited "to determining (1) whether substantial evidence supports the Commissioner's decision, and (2) whether the Commissioner's decision comports with relevant legal standards." *Jones v. Apfel*, 174 F.3d 692, 693 (5th Cir. 1999). Indeed, Title 42, Section 405(g) limits judicial review of the Commissioner's decision: "The findings of  the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive."  The Act specifically grants the district court the power to enter judgment, upon the pleadings and transcript, "affirming, modifying, or reversing the decision of the Commissioner of Social Security with or without remanding the case for a rehearing" when not supported by substantial evidence.  42 U.S.C. § 405(g).   While it is incumbent upon the court to examine the record in its entirety to decide whether the decision is supportable, *Simmons v. Harris*, 602 F.2d 1233, 1236 (5th Cir. 1979), the court may not "reweigh  the evidence in the record nor try the issues *de novo*,  nor  substitute  its  judgment"  for  that  of  the  Commissioner  even  if  the  evidence

preponderates against the Commissioner's decision. *Chaparro v. Bowen*, 815 F.2d 1008, 1009 (5th Cir. 1987); *see also Jones,* 174 F.3d at 693; *Cook v. Heckler*, 750 F.2d 391 (5th Cir. 1985). Conflicts in the evidence are for the Commissioner to resolve. *Anthony v. Sullivan*, 954 F.2d 289, 295 (5th Cir. 1992) (quoting *Hemphill v. Weinberger*, 483 F.2d 1127 (5th Cir. 1973)).

The United States Supreme Court has defined "substantial evidence," as used in the Act, to be "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consolidated Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229 (1938)). Substantial evidence is "more than a scintilla and less than a preponderance." *Spellman v. Shalala*, 1 F.3d 357, 360 (5th Cir. 1993). The evidence must create more than "a suspicion of the existence of the fact to be established, but no 'substantial evidence' will be found only where there is a 'conspicuous absence of credible choices' or 'no contrary medical evidence.'" *Hames v. Heckler*, 707 F.2d 162, 164 (5th Cir. 1983).

## IV. Burden of Proof

An individual claiming entitlement to disability insurance benefits under the Act has the burden of proving her disability. *Johnson v. Bowen*, 864 F.2d 340, 344 (5th Cir. 1988). The Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A). The impairment must be proven through medically accepted clinical and laboratory diagnostic techniques. 42 U.S.C. § 423(d)(3). The impairment must be so severe as to limit the claimant in the following manner:

> [she] is not only unable to do [her] previous work but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which [she] lives, or whether a specific job vacancy exists for [her], or whether [she] would be hired if [she] applied for work.

42 U.S.C. § 423(d)(2)(A).  The mere presence of an impairment is not enough to establish that one is suffering from a disability.  Rather, a claimant is disabled only if she is "incapable of engaging in any substantial gainful activity." *Anthony,* 954 F.2d at 293 (quoting *Milam v. Bowen*, 782 F.2d 1284, 1286 (5th Cir. 1986).

> The Commissioner applies a five-step sequential process to determine disability status:
>
> 1.  If the claimant is presently working, a finding of "not disabled" must be made;
>
> 2.  If the claimant does not have a "severe" impairment or combination of impairments, she will not be found disabled;
>
> 3.  If the claimant has an impairment that meets or equals an impairment listed in Appendix 1 of the Regulations, disability is presumed and benefits are awarded;
>
> 4.  If the claimant is capable of performing past relevant work, a finding of "not disabled" must be made; and
>
> 5.  If the claimant's impairment prevents her from doing any other substantial gainful activity, taking into consideration her age, education, past work experience, and residual functional capacity, she will be found disabled.

*Anthony*, 954 F.2d at 293; *see also Leggett v. Chater*, 67 F.3d 558, 563 n.2 (5th Cir. 1995); *Wren v. Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991).  Under this formula, the claimant bears the burden of proof on the first four steps of the analysis to establish that a disability exists.  If successful, the burden shifts to the Commissioner, at step five, to show that the claimant can perform other work. *McQueen v. Apfel*, 168 F.3d 152, 154 (5th Cir. 1999).  Once the Commissioner demonstrates that other jobs are available, the burden shifts, again, to the claimant to rebut this finding. *Selders v.*

*Sullivan*, 914 F.2d 614, 618 (5th Cir. 1990).  If, at any step in the process, the Commissioner determines that the claimant is or is not disabled, the evaluation ends.  *Leggett*, 67 F.3d at 564.

Here, the ALJ found that Robinson, despite her impairments and limitations, could perform light work with only occasional climbing, balancing, stooping, kneeling, crouching, crawling, and only occasional reaching overhead with left arm, and could perform her past relevant work, and that she therefore was not disabled within the meaning of the Act.  As a result, the Court must determine whether substantial evidence supports the ALJ's step four finding.

In determining whether substantial evidence supports the ALJ's decision, the court weighs four factors: (1) the objective medical facts; (2) the diagnosis and expert opinions of treating, examining and consultative physicians on subsidiary questions of fact; (3) subjective evidence as testified to by the plaintiff and corroborated by family and neighbors; and (4) the plaintiff's educational background, work history, and present age.  *Wren*, 925 F.2d at 126.

## V.  Discussion

### A.  Objective Medical Evidence

The objective medical evidence shows that Robinson had two work related injuries to her back, the first on October 9, 1998, and the second on January 4, 1999.  According to the medical records submitted to the Appeals Council, Robinson was referred by her primary care physician, Dr. Patel, to Dr. S. Ali Mohamed, a specialist in pain management.  Dr. Mohamed opined that Robinson had bilateral lumbar facet syndrome, bilateral sacroiliitis, lumbar radiculopathy and myofascial pain syndrome, lumbar discogenic pain and right knee internal derangement syndrome.  (Tr. 37).  Dr. Mohamed's treatment primarily consisted of post lumbar epidural steroid injections, to which Robinson reported improvement.  For instance, on March 3, 1999, Robinson reported "significant

relief of her bilateral lower extremity pain." (Tr. 27). Likewise, at her May 5, 1999, appointment Robinson reported that "pain over her right shoulder and right knee improved." (Tr. 31). Also, on June 23, 1999, Robinson had a full range of motion of her right knee. (Tr. 33-34). The results of x-rays and MRI's taken during this time period of the knee and spine showed no abnormalities. An x-ray of Robinson's lumbar spine taken January 4, 1999, was normal and she had no spondylolisthesis. (Tr. 24-25). Similarly, the results of an x-ray and a MRI of the sacrum were normal. (Tr. 42). On March 18, 1999, Robinson had an x-ray and MRI taken of her right knee and lumbar spine. The knee x-ray was negative and the MRI of the knee showed minimal joint effusion. (Tr. 41, 60). The MRI of the lumbar spine showed no spondylolisthesis. (Tr. 47). Robinson underwent an evaluation by Jane T. Duncan, D.C. on June 6, 1999. (Tr. 49-53). Dr. Duncan noted that Robinson reported that "her right shoulder does not bother her." (Tr. 53).

Robinson had another car accident on November 22, 2001. (Tr. 64-65). According to Dr. Mohamed's treatment note, Robinson had "cervical sprain/strain with accompanying neck pain." (Tr. 65). Robinson also lacerated her arm. (Tr. 76-79). She received treatment for the arm laceration at Herman Hospital. (Tr. 78-96). Robinson was also treated from November 30, 2001 to February 6, 2002, at the All Family Chiropractic Health Center. (Tr. 307-311). The chiropractic records show Robinson reported feeling "better" following her twenty-two treatments (Tr. 307-309). On June 2, 2005, Dr. Patel completed a "physical Residual Functional Capacity Evaluation" based on his treatment of Robinson from November 30, 2001 to February 2, 2002. (Tr. 316-321).

The medical records also reveal that Robinson sought treatment for lumbar strain and her left arm in 2002. With respect to Robinson's complaints of numbness and low back pain, she was referred for an MRI (Tr. 263, 265-266, 285) and x-ray both of which were taken on September 9, 2002. (Tr. 261, 262, 264, 273). The MRI showed "mild central canal stenosis at L4-L5 due to the

presence of nonspecific spondylotic bulge and facetal osteoarthritis." (Tr. 266).   The x-ray revealed

no bony or soft tissue abnormalities at L5-S1, and at L4-L5 there was

> "a mild nonspecific spondylotic bulge is seen which along with mild degenerative changes of the facets bilaterally results in mild central canal stenosis.   No disc herniations.   There is mild narrowing of the inferior aspects of the neural foramina slightly greater on the left.   A punctate focus of increased T2 signal in the posterior aspect of the annulus is felt to be consistent with an annular fissure.   Otherwise, no additional abnormalities are seen.   The vertebral bodies and disc spaces are normal in height and signal intensity throughout the lumbar region.   The conus is well visualized with its tip at the mid L1 level." (Tr. 263, 265, 285).

At a follow-up appointment on November 21, 2002, Robinson "presented much improved."  (Tr.

237).  The medical records show that Robinson was seen on March 24, 2003, June 30, 2003, and

August 6, 2003, for chronic low back pain.  (Tr. 233, 230, 253).  Robinson repeatedly complained

of lower back pain/joint pain.  (Tr. 272, 295, 305).   Robinson was diagnosed with rheumatoid

arthritis in January 2004.  (Tr. 225).

In addition to lower back pain, Robinson complained of, and was treated for, left arm pain.

On May 13, 2002, Robinson went to the ER complaining of left arm pit pain, which she stated had

started six months earlier, and left leg pain.  (Tr. 253-254).  The treating note reveals that Robinson

had "significant" left arm swelling and a limited range of motion.  (Tr. 254).  Two months later, on

July 10, 2002, Robinson had a left biceps rupture.  (Tr. 247).  Robinson's motor strength measured

5/5, but she had only 80 percent abduction and adduction in left arm.  (Tr. 251).  Because of this

injury, Robinson was referred for physical therapy on July 17, 2002.  (Tr. 245-246).  The notes of

the physical therapy session show that Robinson had a decreased range of motion and decreased

strength in her left upper extremity.   In addition, Robinson had scar tissue and adhesions and

lymphedema.  (Tr. 245-246).  Robinson attended physical therapy on July 19, July 26, August 1,

August 5, August 9, August 14, August 16, August 22, August 27, September 16, and October 3,

2002. On August 22, 2002, because Robinson still had left arm pain and swelling, she was referred for nerve testing. (Tr. 250). The results of an August 27, 2002, Electromyography Report were abnormal. (Tr. 259-260). According to the evaluator, there was "electrodiagnostic evidence of bilateral moderate sensory-motor, axonal-demyelinating median neuropathy at the wrist [right greater than left]." (Tr. 260). In addition, Robinson's motor strength was 5/5, there was a reduction of her sensory reflexes in the left posterior/medial arm, her reflexes were 1+, and she had no muscle bulk atrophy. (Tr. 259). Robinson complained of right hand numbness at her September 23, 2002, appointment. (Tr. 239-240). Robinson's carpal tunnel was rated as "moderate" on November 21, 2002. (Tr. 237-238).

As to Robinson's treatment for left knee pain, the medical records show that on February 8, 2000, Robinson twisted her left knee getting out of a truck. She thereafter sought medical treatment for pain and swelling. An x-ray of the left knee was normal. (Tr. 221). According to the treatment note, Robinson had a full range of motion in the left knee but had pain upon flexion. Robinson was prescribed a knee brace. (Tr. 255).

In addition, the medical records show that Robinson has hypertension, which responded to medication. There is no suggestion in any of the records of organ damage caused by hypertension or any mention that Robinson's hypertension was uncontrollable.[2]

---

[2] A summary of Robinson's blood pressure taken from February 8, 2002 through December 10, 2004, reveals that her pressure, with medication, was within acceptable therapeutic levels. For instance, Robinson's pressure was 124/66 on February 8, 2000 (Tr. 255), 178/82 on November 30, 2001 (Tr. 311), 175/115, 160/110, 138/87 on May 13, 2002 (Tr. 252-253), 124/73 on August 22, 2002 (Tr. 250), 150/79, 145/78 on November 21, 2002 (Tr. 237), 142/73 on February 21, 2003 (Tr. 234), 158/83, 142/80 on March 24, 2003 (Tr. 233), 148/68 on May 6, 2003 (Tr. 232), 146/90 on June 30, 2003 (Tr. 252), 99/71 on August 6, 2003 (Tr. 229), 100/66 on October 15, 2003 (Tr. 228), 144/75 on November 6, 2003 (Tr. 227), 103/56 on December 11, 2003 (Tr. 226), 123/61 on January 26, 2004 (Tr. 225), 136/78 on March 26, 2004 (Tr. 245), 149/82 on June 16, 2004 (Tr. 305), 130/68 on October 21, 2004 (Tr. 302), and 139/76 on December 10, 2004 (Tr. 295).

The medical records also reflected Robinson's weight, which was taken when she sought medical attention.  Overall, the medical records are silent as to whether Robinson's weight was discussed with her, and if so, the subject matter of the discussion.  The records show that Robinson was five feet two inches tall and her weight fluctuated around 240 pounds, plus or minus ten pounds.[3]

Finally, Robinson was referred by the social security administration for a consultative evaluation by Dr. Frank Barnes.  In connection with this examination, Robinson had x-rays taken of her spine.  According to the radiologist report, the lumbar spine, sacrum, coccyx, pelvis and femoral head were normal.  (Tr. 294).  Dr. Barnes interviewed Robinson and examined her on March 28, 2005.  The results of Dr. Barnes' physical examination of Robinson follows:

> General:  She is 5'3" tall and weighs 245 pounds.  Her affect is somewhat anxious and she comes walking very slowly with a cane, but she can walk without the cane, but she is slower.  She states that the cane is prescribed by her physician.
>
> Manual Muscle Testing:  Manual muscle testing is normal on the right upper extremity and both lower extremities.  However, she has a global grade 4 to 5 weakness in the left upper extremity.  This does not follow a definite anatomic pattern.
>
> Left Shoulder:  The left shoulder is stable.  There is no sulcus sign, no apprehension sign, and the humeral head does not translate.  She can abduct 70 degrees, flex 80 degrees, externally rotate 90 degrees, and internally rotate 90 degrees.  There is a scar on the left proximal deltoid area, proximal to which there is a soft swelling of the skin up to the level of the acromion.  There is no crepitation of the shoulder and no increased temperature.  Sensory testing of the upper extremities is normal.  Both arms

---

[3] A sampling of Robinson's weight follows:  244 pounds on February 8, 2000 (Tr. 255), 237 pounds on May 13, 2002 (Tr. 253), 252 pounds on July 10, 2002 (Tr. 252), 249.4 pounds on August 22, 2002 (Tr. 250), 261 pounds on November 21, 2002 (Tr. 237), 250 pounds on March 24, 2003 (Tr. 233), 246 pounds on May 6, 2003 (Tr. 232), 252 pounds on June 30, 2003 (Tr. 230), 253 pounds on August 6, 2003 (Tr. 229), 249 pounds on October 15, 2003 (Tr. 228), 250 pounds on November 6, 2003 (Tr. 227), 251 pounds on December 11, 2003 (Tr. 226), 251 pounds on January 26, 2004 (Tr. 225), 245 pounds on March 26, 2004 (Tr. 268), 246 pounds on June 16, 2004 (Tr. 305), 238 pounds on October 21, 2004 (Tr. 302), and 243 pounds on December 10, 2004 (Tr. 295).

measure 16-1/2 inches measured at the central part of the biceps muscle and both
forearms measure 12-1/2 inches.  Wrist pulses are normal.

Lumbar Spine:  Curvature is normal without list, spasm, or rigidity.  The curvature
reverses well.  There is tenderness to very light touch over the right lumbar spine and
the right iliac.  She can bend forward 60 degrees, extend 30 degrees, and bend 20
degrees right and 15 degrees left.  Babinski's test is slightly downward which is
normal.  Straight leg raising tests are negative sitting.  When supine, she complains
of pain at 60 degrees of straight leg raising on the right and pain in the thigh at 60
degrees with pain in the lumbar spine.  Knee and ankle reflexes are 1+.  Pelvic
rocking causes pain and pelvic compression and simulated rotation and axial
compression do not.  The thighs are 28 ½ inches in circumference and the calves are
16-1/2 inches.  She can walk slowly on her heels and toes and Romberg's test for
balance is normal.  Sensory testing of the lower extremities shows hypesthesia on the
medial side of the right thigh, medial side of the left calf, and the dorsum of her right
foot.  These areas are served by the right L3 nerve and the left L4 and L5 nerves.

Comments: The global weakness in the left upper extremity is either a response to
pain or avoidance of pain and is not the results of her damage as far as I can tell.
The tenderness to very light touch, barely indenting the skin, does not indicate
irritability of underlying muscular structures.  Straight leg raising tests are fairly
compatible and not definitely indicative of radiculopathy.  There is no atrophy in the
upper or lower limbs which indicates that she is using both sides of her body equal.

I also do not know on what basis the spinal surgery has been proposed, the only MRI
scan Exhibit B5F15 indicates minimal abnormalities and, unless there is significant
additional data, I can find no justification for lumbar surgery.

Diagnoses:      1.  Laceration left arm with probable laceration of
                biceps tendon

                2.  Lumbar strain syndrome

Work Status:  As far as her back, I believe that this is a soft tissue injury and lumbar
strain and these generally heal within two months of the injury.  I do not think this
is a limiting factor.  In the left arm, she may have some residual weakness from her
injury and this would limit her probably to a medium level of work as she has no
impairment of the right upper extremity.  I have filed out the accompanying Form
HA-1151-U4 in accordance of this opinion.  (Tr. 288-289).

In addition, Dr. Barnes completed a form entitled "Medical Source Statement of Ability to do Work-

Related Activities (Physical)" in which he opined about any exertional, postural, manipulative,

visual/communicative, and environmental limitations that Robinson had as a result of any documented physical impairments.  (Tr. 290-293).  According to Dr. Barnes, Robinson had no environmental, or visual/communicative limitations.  As to exertional limitations, Dr. Barnes opined that Robinson could occasionally lift/carry fifty pounds, could frequently lift/carry 20 pounds, and had no limitations standing/walking or sitting.  Also, Dr. Barnes found that Robinson needed no "medically required hand-held assistive device [] necessary for ambulation."  (Tr. 290).  However, as to pushing/pulling limitations, Dr. Barnes opined that Robinson was  "limited in upper extremities."  (Tr. 291).  Namely, Robinson was limited in her left arm to twenty pounds force.  (Tr. 291).  In addition, Dr. Barnes evaluated postural limitations that Robinson had based on her impairments.  Dr. Barnes found she could frequently balance, kneel, crouch, crawl, and stoop.  However, because of her left arm, Robinson's ability to climb, which was broken down by "ramps/stairs/ladder/ rope/scaffold" was rated as "never." (Tr. 291).  Dr. Barnes further amplified this finding:  "left arm injury will prevent climbing ropes [and] ladders [and] scaffold.  No impairment to climbing stairs or ramps."  (Tr. 291).  Finally, with respect to any manipulative limitations, Dr. Barnes opined that Robinson had no limitations with handling, fingering and feeling.  However, as to "reaching all directions (including overhead)", Dr. Barnes opined that Robinson was "limited" in this area and that while she could reach, she could do so only on an occasional basis.  (Tr. 292).  Dr. Barnes supported this limitation by reference to Robinson's "limited left shoulder motion [and] strength."  (Tr. 292).

Upon this record, the objective medical evidence factor weighs in favor of the ALJ's decision at steps one through three.  There is simply no objective medical evidence that Robinson's lumbar strain, status post laceration, left arm and obesity are of such a degree, either individually or in combination, that they meet or equal a listing.  With respect to hypertension, the medical records

show that Robinson's hypertension responded to medication and was well controlled.  As to Robinson's contention that the ALJ failed to consider her obesity in combination with her other impairments at step three, and in determining her RFC at step 4, the record refutes Robinson's contention that the ALJ did not consider obesity as mandated by SSR 02-01p.  Indeed, the ALJ wrote:

> The medical evidence of record reports that the claimant has a height of 5'3" with a weight of 245 pounds.  Regarding the claimant's obesity, effective October 25, 1999, medical listing 9.09 (obesity) was deleted from Appendix 1, Subpart p of Part 404 of the Code of Federal Regulations (listing of impairments).  Therefore, the undersigned considered what effect the claimant's obesity, by itself and in combination with other impairments, has on her ability to perform daily living and working activities (See Federal Register:  August 4, 1999 (volume 64, Number 163, pages 46122-46129)).  (Tr. 111).

While it is true, as Plaintiff notes, that the ALJ did not elaborate in his opinion regarding his analysis of Robinson's obesity, based on the totality of the ALJ's decision and his summary of the medical evidence, any error on the ALJ's part to elaborate further was harmless.  None of the medical records suggest that Robinson's weight had any bearing on her impairments.  Indeed, the thorough consultative examination by Dr. Barnes mentioned Robinson's height and weight but otherwise made no mention of the impact, if any, her weight had on her muscle testing, left shoulder or lumbar spine.  Overall, Dr. Barnes opined that Robinson's soft tissue injury and lumbar strain were the types of injuries that heal in time and that her left arm weakness would limit her to medium level work. (Tr. 289).

### B.  Diagnosis and Expert Opinion

The second element considered is the diagnosis and expert opinions of treating and examining physicians on subsidiary questions of fact.  Unless good cause is shown to the contrary, "the opinion, diagnosis, and medical evidence of the treating physician, especially when the

consultation has been over a considerable amount of time, should be accorded considerable weight." *Perez v. Schweiker*, 653 F.2d 997, 1001 (5th Cir. 1981). For the ALJ to give deference to a medical opinion, however, the opinion must be more than conclusional and must be supported by clinical and laboratory findings. *Scott v. Heckler*, 770 F.2d 482, 485 (5th Cir. 1985); *Oldham v. Schweiker*, 660 F.2d 1078 (5th Cir. 1981). Indeed, "[a] treating physician's opinion on the nature and severity of a patient's impairment will be given controlling weight if it is 'well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with ... other substantial evidence.'" *Newton v. Apfel*, 209 F.3d 448, 455 (5th Cir. 2000) (quoting *Martinez v. Chater,* 64 F.3d 172, 176 (5th Cir. 1995)). The opinion of a medical specialist is generally accorded more weight than opinions of non-specialists. *Id.* "'[T]he Commissioner is free to reject the opinion of any physician when the evidence supports a contrary conclusion.'" *Martinez,* 64 F.3d at 176 (quoting *Bradley v. Bowen*, 809 F.2d 1054, 1057 (5th Cir. 1987)). Further, regardless of the opinions and diagnoses of medical sources, "the ALJ has sole responsibility for determining a claimant's disability status." *Martinez*, 64 F.3d at 176.

The Social Security Regulations provide a framework for the consideration of medical opinions. Under 20 C.F.R. §§ 404.1527(d)(2)-(6), 416.927(d)(2)-(6), consideration of a physician's opinion must be based on:

(1)     the physician's length of treatment of the claimant,

(2)     the physician's frequency of examination,

(3)     the nature and extent of the treatment relationship,

(4)     the support of the physician's opinion afforded by the medical evidence of record,

(5)     the consistency of the opinion with the record as a whole, and

(6)    the specialization of the treating physician.

*Newton,* 209 F.3d at 456.  While opinions of treating physicians need not be accorded controlling weight on the issue of disability, in most cases such opinions must at least be given considerable deference.  *Id.*  Again, the Social Security Regulations provide guidance on this point.  Social Security Ruling 96-2p provides:

> [A] finding that a treating source medical opinion is not well supported by medically acceptable clinical and laboratory diagnostic techniques or is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to "controlling weight," not that the opinion should be rejected.  Treating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in 20 C.F.R. 404.1527 and 416.927.  In many cases, a treating source's medical opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight.

Social Security Ruling (SSR) 96-2p, 61 Fed. Reg.34490 (July 2, 1996).  With regard to the weight to be given  "Residual Functional Capacity Assessments and Medical Source Statements," the rule provides that "adjudicators must weigh medical source statements under the rules set out in 20 C.F.R. 404.1527 ... providing appropriate explanations for accepting or rejecting such opinion."  *Id.*

The Fifth Circuit adheres to the view that before a medical opinion of a treating physician can be rejected, the ALJ must consider and weigh the six factors set forth in 20 C.F.R. § 404.1527(d).  *Newton,* 209 F.2d at 456.  "The ALJ's decision must stand or fall with the reasons set forth in the ALJ's decision, as adopted by the Appeals Council."  *Id.* at 455; *see also Cole v. Barnhart*, 288 F.3d 149, 151 (5th Cir. 2002) ("It is well-established that we may only affirm the Commissioner's decision on the grounds which he stated for doing so.").  However, perfection in administrative proceedings is not required. *See Mays v. Bowen*, 837 F.2d 1362, 1364 (5th Cir. 1988).

Robinson argues that the ALJ erred by disregarding without explanation the functional limitations described by Dr. Barnes.  According to Robinson, Dr. Barnes' opinion is internally

inconsistent and therefore flawed because he found that Robinson could never climb ramps/stairs/ladders/rope/scaffold but also opined that her "left arm injury will prevent climbing ropes, and ladders and scaffolds.  No impairment to climbing stairs or ramps."  (Tr. 291).  On its face, Dr. Barnes' opinion could be considered inconsistent as argued by Robinson.  However, given the totality of Dr. Barnes' opinion, it is clear that Dr. Barnes was responding to the breakdown of each postural limitation as identified in the listing (ramps, stairs, ladders, rope and scaffold) and according to his findings that Robinson was limited in some areas, but not all.

Robinson next argues that the ALJ erred in discounting Dr. Barnes' opinion, without explanation, that Robinson was limited in "reaching all directions (including overhead)."  Robinson suggests the ALJ's RFC finding limited to "only occasional reaching overhead with left arm" is inconsistent with Dr. Barnes' finding that she was limited in reaching *all* directions.  Upon this record, it is unclear why the ALJ discounted Dr. Barnes' conclusions regarding Robinson's ability to reach.  Given that Dr. Barnes' opinion was not controverted, and was supported by the objective medical evidence, and given that the ALJ did not discuss or explain his consideration of all of the restrictions identified by Dr. Barnes, remand is warranted.  On remand, the ALJ should discuss why he adopted some of the restrictions identified by Dr. Barnes and disregarded other limitations.

### C.  Subjective Evidence of Pain

The next element to be weighed is the subjective evidence of pain, including the claimant's testimony and corroboration by family and friends.  Not all pain is disabling, and the fact that a claimant cannot work without some pain or discomfort will not render her disabled.  *Cook,* 750 F.2d at 395.  The proper standard for evaluating pain is codified in the Social Security Disability Benefits Reform Act of 1984, 42 U.S.C. § 423.  The statute provides that allegations of pain do not constitute conclusive evidence of disability.  There must be objective medical evidence showing the existence

of a physical or mental impairment which could reasonably be expected to cause pain.  Statements made by the individual or his physician as to the severity of the plaintiff's pain must be reasonably consistent with the objective medical evidence on the record.  42 U.S.C. § 423.  "Pain constitutes a disabling condition under the SSA only when it is 'constant, unremitting, and wholly unresponsive to therapeutic treatment.'" *Selders*, 914 F.2d at 618-19 (citing *Darrell v. Bowen*, 837 F.2d 471, 480 (5th Cir. 1988)).  Pain may also constitute a non-exertional impairment which can limit the range of jobs a claimant would otherwise be able to perform.  *See Scott v. Shalala*, 30 F.3d 33, 35 (5th Cir. 1994).  The Act requires this Court's findings to be deferential.  The evaluation of evidence concerning subjective symptoms is a task particularly within the province of the ALJ, who has had the opportunity to observe the claimant.  *Hames,* 707 F.2d at 166.

Here, Robinson testified about her condition.  Robinson testified that she is left handed.  (Tr. 328).  With respect to her weight, Robinson stated that she had struggled with her weight for the past six years.  Six years ago she weighed 183 pounds and at the time of the hearing weighed 247 pounds.  (Tr. 329).  According to Robinson, she has attempted to lose weight following a diet a doctor gave her.  (Tr. 344).  Robinson was questioned about her past work as a security guard.  According to Robinson, as a security guard she was on her feet most of the time.  (Tr. 330).  She testified "I was on my feet a lot.  Sometime sit but lately on my feet a lot of walking. Key rounds."  (Tr. 330).  Robinson further testified that as a security guard she had to lift. (Tr. 330).  Robinson described the lifting that she did as a security guard as follows:  "Like opening the trunk of cars we check cars we work at the auction. Like lifting the hood on the car, just like some paperwork, no heavy lifting."  (Tr. 330).  Robinson testified that because of her pain, she can no longer work as a security guard.

(Tr. 331).   As to her daily activities, Robinson testified that she gets up, eats, takes her medicine,[4] watches television and sleeps." (Tr. 333).   Robinson further testified that she spends "a lot of her days laying down." (Tr. 333, 344-345).   Robinson testified that she does a little housework such as washing dishes but has no outside hobbies or activities, other than attending church on Sunday and a bible study course during the week.  (Tr. 333-334).   Robinson testified that she does not sleep much because of the pain.  She further testified that despite the pain, her appetite remains strong. (Tr. 334).   Robinson stated that she has pain in her lower back, and that her legs get numb.  (Tr. 335). As to her left arm, she stated that she cannot reach overhead and her arm feels "heavy."  (Tr. 336). In addition, Robinson testified that she has carpal tunnel in her right arm (Tr. 337), and because of arthritis, her body aches all over.  (Tr. 337).   Robinson testified that she wears a back brace and uses a cane to ambulate.  Robinson estimated that she uses the cane about three days a week and when she goes to church.  (Tr. 339).  Also, Robinson testified she wears a bandage on her left wrist.  (Tr. 339, 346).  Robinson estimated that she could stand five minutes but would have trouble sitting due to back pain.  (Tr. 339-340).  Likewise, Robinson testified she would have problems with steps, bending and stooping.  (Tr. 340).  Robinson estimated she could lift 5 pounds.  (Tr. 341).

Here, the ALJ found that Robinson's complaints and subjective symptoms were not entirely credible.  In so doing, the ALJ wrote:

> Considering the record as a whole, the Administrative Law Judge concludes that the claimant may experience some of the subjective symptoms which she alleges but not to the degree alleged.  The claimant's testimony is an overstatement of her subjective symptoms and functional limitations and is only generally credible.  As stated above, the claimant testified that she is in constant pain and is limited in standing, walking and sitting, however, there is no objective medical evidence in the record to substantiate the claimant's allegations that she is unable to do any work. Additionally, none of [her] physicians have set out any limitations in their records,

---

[4] Robinson takes blood pressure medication (amiloride), and medication for pain (hydrocodone, vioxx, neurontin, amitriptyline, and cyclobenzaprine (Tr. 215-218).

which would preclude the performance of the residual functional capacity, as determined by the Administrative Law Judge. (Tr. 112).

Here, because the ALJ made and supported his credibility determination, based in part on Robinson's RFC, and given that the matter should be remanded for further development of the record, and because the credibility assessment is inextricably intertwined with the ALJ's assessment of Robinson's RFC, which is not supported by substantial evidence, this factor neither weighs in favor of nor against the ALJ's determination.

### D.  Education, Work History, and Age

The final element to be weighed is the claimant's educational background, work history and present age.  A claimant will be determined to be under disability only if the claimant's physical or mental impairments are of such severity that she is not only unable to do her previous work, but cannot, considering her age, education and work experience, engage in any other kind of substantial gainful work which exists in the national economy.  42 U.S.C. § 423(d)(2)(A).

The record shows that Robinson, at the time of the hearing,  was forty-six years old, and had an eleventh grade education.  Robinson's past work was as a hospital housekeeper, a nurse's aide and a security guard.  Here, the ALJ, at step four, concluded that because Robinson retained the RFC for light work with only occasional climbing, balancing, stooping, kneeling, crouching, crawling and only occasional reaching overhead with left arm that she could perform her past work as a security guard, and was therefore, not disabled within the meaning of the Act.  To the extent that Robinson contends that the ALJ erred by not relying on the testimony of a vocational expert, because the determination was made at step four and not step five, it was within the province of the ALJ to make this determination without testimony by a vocational expert.  As such, there was no error on the part

of the ALJ as the services of a vocational expert are generally utilized at step five and not step four.

Robinson further argues that the ALJ erred at step four by not following the proper legal standards in determining that she could perform her past relevant work as a security guard. Robinson contends that the ALJ should have considered her reliance on a cane and whether such use of a cane might subject her to further injury as a security guard. According to Robinson, she testified that she uses a cane and that a cane had been prescribed for her use by a doctor. Robinson argues that the ALJ should have considered her reliance on a cane in assessing her RFC. In response, the Commissioner argues that the ALJ properly determined that Robinson could perform her past relevant work and was aware of the requirements of a security guard and his decision implicitly accounted for the demands of this position, including Robinson's use of a cane and how she performed the job as a security guard as demonstrated by her testimony about her job duties (Tr. 330-332) and through her application for benefits, in which she detailed her past relevant work. With respect to Robinson's arguments that the ALJ failed to consider her need for a cane to ambulate, upon this record, Robinson's testimony was inconsistent with her contention that she needs a cane to ambulate. Robinson did not testify that she cannot walk without the cane. Rather, she testified that she uses the cane, approximately three times a week. Moreover, there is no evidence in the record to substantiate Robinson's claim that her doctor prescribed a cane for her use. Rather, Dr. Barnes noticed that Robinson used a cane, but noted that she can walk without the came, only slower. (Tr. 288). Indeed, Dr. Barnes did not check the box that Robinson had a need for "medically required hand-held assistive device." (Tr. 290). Turning to Robinson's next argument that the ALJ erred at step four by not making required factual findings in support of his step four finding that she retained the RFC to return to her past relevant work, Robinson's arguments are well

taken.  In situations such as here, where the ALJ determines that the claimant can perform their past

relevant work, SS Ruling 82-62 requires that the decision contain the following specific findings:

>    1.  A finding of fact as to the individual's RFC
>
>    2.  A finding of fact as to the physical and mental demands of the past
>    job/occupation.
>
>    3.  A finding of fact that the individual's RFC would permit a return to her past job
>    or occupation.

Here, the ALJ wrote:

>    Based upon the residual functional capacity, as determined by the undersigned
>    Administrative Law Judge, the claimant could return to her past relevant work as a
>    security guard.  The evidence establishes that the claimant could return to this
>    occupation as generally performed in the national economy based on its description
>    in the Dictionary of Occupational Titles (DOT).  (Tr. 113).

In *Latham v. Shalala*, 36 F.3d 482, 484 (5th Cir. 1994), the Fifth Circuit instructed with respect to

step four:

>    when making a finding that an applicant can return to his prior work, the ALJ must
>    directly compare the applicant's remaining functional capacities with the physical
>    and mental demands of his previous work.  He must make clear factual findings on
>    that issue.  The ALJ may not rely on generic classifications of previous jobs.
>    (citations omitted).

Even assuming, as argued by the Commissioner, that the ALJ relied on Robinson's testimony at the

administrative hearing as well as on her work activity reports submitted in support of her application,

(Tr. 178-179, 183-184),[5] the ALJ's cursory analysis falls short of what is required by *Latham* and

SSR 82-62.  There is no mention by the ALJ of the specific requirements of the security guard job,

and no assessment of Robinson's ability to perform that job.   Here, as in *Bean v. Barnhart*, 454

---

[5] For instance, in her application, Robinson indicated that her job involved walking, standing, sitting, climbing, stepping, kneeling, lifting, and reaching.  With respect to reaching, Robinson indicated that she lifted car trunks and she lifted and carried packages.  (Tr. 179).  Likewise, she indicated in her daily activity questionnaire form that she cannot raise her feet off the ground or lift her arms to shoulder length.  (Tr. 183).

F.Supp.2d 616, 621 (E.D.Tex. Aug. 11, 2006), the ALJ's analysis at step four was cursory. The Court in *Bean* wrote: "[this] decision nowhere recites or otherwise reflects the physical and mental demands of the plaintiff's previous job or occupation.  It does not discuss how plaintiff's residual functional capacity permits him to return to his past work, particularly with respect to pushing and pulling.  It does not "show clearly how specific evidence leads to a conclusion" that plaintiff can perform prior relevant work."  Therefore, the decision fails to adhere to the requirements of Social Security Ruling 82-62."

 Even though the ALJ erred at step four, such error does not necessarily and automatically result in a reversal or remand.  With respect to when a matter should be remanded or reversed,

> [r]eversal and remand for failure to comply with a *ruling* is appropriate only when a complainant affirmatively demonstrates ensuant *prejudice*.  Courts may not reverse and remand for failure to comply with a *regulation* without first considering whether the error was harmless.
>
> Prejudice and harmless error analysis, although different procedurally, are similar in substance.  A claimant establishes prejudice by showing that adherence to the ruling might have led to a different decision.  Harmless error exists when it is inconceivable that a different administrative conclusion would have been reached absent the error. (emphasis in original) (citations omitted).

*Bornette v. Barnhart*, 466 F.Supp.2d 811, 816 (E.D. Tex. Nov. 28, 2006).  Here, given that Robinson's RFC must be redetermined, upon this record, it is unclear that Robinson could perform her past relevant work as a security guard.  This error is not harmless in so far as adherence to the proscribed analysis might have led to a different conclusion.  Robinson has shown prejudice and therefore the case should be remanded for further consideration by the Commissioner.

Given that the matter should be remanded for further consideration, which may affect the ALJ's assessment of Robinson's residual functional capacity, the ALJ should reconsider Robinson's's ability to perform her past relevant work, or any work.

**V.  Conclusion**

Based on the foregoing, and the conclusion that further consideration of the record is necessary because substantial evidence does not support the ALJ's finding that Robinson could perform her past relevant work, and that based on this infirmity in the ALJ's opinion substantial evidence does not support the ALJ's decision, it is

ORDERED that Defendant's Motion for Summary Judgment (Document No. 23), is DENIED, that Plaintiff's Motion for Summary Judgment (Document No. 22) is GRANTED, and this case is REMANDED to the Social Security Administration pursuant to sentence four of 42 U.S.C. §405(g), for further proceedings consistent with this Memorandum and Order.

Signed at Houston, Texas, this 23 day of July, 2007.


Frances H. Stacy
United States Magistrate Judge